UNITED STATES v. SALMON. See Case No. 14,820.

## Case No. 16,216a.

### UNITED STATES v. SAMPERYAC et al.

[Hempst. 118.] [1]

Superior Court, Territory of Arkansas. Feb., 1831.[2]

EQUITY — FEIGNED ISSUES — BILL OF REVIEW — PLEADING — FRAUD — ADMISSIONS — DECREE PRO CONFESSO — ASSIGNABILITY OF DECREES — CONVEYANCE—INNOCENT PURCHASERS.

1. It rests in the sound discretion of the chancellor to award a feigned issue, or not; and it is done to enable him to obtain additional facts, and to arrive at a satisfactory conclusion on the facts of the case.

2. The verdict of the jury on a feigned issue is not conclusive, for the chancellor may have tried again and again, and may even decree against a verdict.

3. Where there is sufficient proof to enable the chancellor to decide, the parties should not be subjected to the delay and expense of a trial at law.

4. The act of May 26, 1824 (4 Stat. 52), confers on this court the powers of a court of chancery, for the purpose of trying the validity of claims mentioned in that act, and a bill of review may be maintained therein.

5. A bill of review lies either for error in law, appearing on the face of the decree, or for new material matter, that has come to light afterwards, and which could not have been used at the time the decree was made.

[1] [Reported by Samuel H. Hempstead, Esq.]
[2] [Affirmed in 7 Pet. (32 U. S.) 222.]

6. The bill must be founded on new matter to prove what was before in issue, for a party cannot be entitled to a bill of review on new matter, to prove a title which was not in issue.

7. Where a fraudulent claim was set up, and sustained by false testimony, the decree may be reversed and annulled, on a bill of review, and no rights can be acquired under such former decree.

8. When the allegations of a bill are distinct and positive, they are taken as true, without proof, after a decree pro confesso; which, in its effect, is like a judgment by nil dicit at law.

9. But where the allegations are so defective or vague, that a precise decree cannot be rendered upon them, proof must necessarily be adduced before a decree can be made.

10. A refusal to deny, where a party is legally bound to speak, is equivalent to an admission of the charges against him. What is admitted need not be proved.

11. The general denial of allegations, by one uninformed as to their truth, will not be sufficient to dissolve an injunction.

12. A bill of review will be barred by the lapse of a reasonable time, after discovery of the new matter; but what shall be considered reasonable time, depends upon the sound discretion of the chancellor, under all the circumstances of the case.

13. Fraud, deduced from circumstances, may be sufficient to outweigh positive proof to the contrary.

14. Startling frauds and forgeries proved and commented on.

15. Judgments and decrees are not assignable at law, so as to vest the legal title in the assignee, and the latter takes only an equitable interest, which is subject to every equity and charge which attached to them in the hands of the assignor.

16. A purchaser for a valuable consideration, without notice, must be clothed with the legal title, and not a mere equity, in order to protect himself.

17. No one can occupy the attitude of an innocent purchaser, under a forged claim and conveyance.

18. Construction of the act of congress of the 8th May, 1830 (4 Stat. 399), and *held* not to require the observance of all the technical rules in the ordinary course of chancery practice on a bill of review, under that act.

19. Almost every law providing a new remedy, affects causes of action existing at the time the law is passed; but such a law is not for that reason invalid.

[Cited in brief in Rich v. Flanders, 39 N. H. 365.]

20. It is incontestable, that a grantee can convey no better title than he possesses, and hence, those who come in under a void grant acquire nothing.

Bill of review in chancery. Bernardo Samperyac, under the act of congress of the 26th of May, 1824 (7 Laws U. S. 300 [4 Stat. 52]), entitled "An act enabling the claimants to lands within the limits of the state of Missouri and territory of Arkansas to institute proceedings to try the validity of their claims," by R. C. Oden, his solicitor, filed his bill against the United States, in the office of the clerk of the superior court of the territory of Arkansas, on the 21st of November, 1827; stating that he, an inhabitant of the province of Louisiana, on the 6th of October, 1789, addressed a petition to the governor of the said province and its dependencies, asking a grant of land in full property, on Strawberry river in Arkansas district, containing ten arpens in front by the usual depth; that on the 11th of October, 1789, Miro, the governor of the province of Louisiana, made the grant as requested, and at the same time issued an order of survey to the surveyor-general of the province, to the end that the boundaries of the grant might be defined for the purpose of making a title in form; that this grant was secured by the treaty between the United States and France of the 30th of April, 1803, and would have been perfected into a perfect title under the government under which it originated, had there been no change of sovereignty; and the bill prayed the court to confirm the said grant, according to the provisions of the act of congress before mentioned, and that process be issued against the attorney of the United States for the territory of Arkansas, to appear and answer the bill.

The petition of Samperyac, and the order of survey, in the Spanish language, attached to the bill as exhibits, translated by James H. Lucas, the sworn interpreter and translator of the court, were as follows, namely:—

Petition: "To the Governor of the Province of Louisiana and Its Dependencies, &c., &c. Bernardo Samperyac, wishing to establish himself on Strawberry river in the Arkansas district, prays that you will do him the favor to grant him ten arpens of land in front by the usual depth, being the lands of his Catholic majesty, and not causing any prejudice; a favor your petitioner hopes to receive from your bounty; and he will ever pray to God for your health. Bernardo Samperyac. New Orleans, 6th Oct., 1789."

Order of Survey: "New Orleans, 11th Oct., 1789. The surveyor of this province, Don Charles Trudeau, will establish this tract, on the ten arpens of land requested, by the usual depth, and will mention the bounds, in order that they may appear at the time that the boundaries have to be defined, for the purpose of making a title in form. Miro."

Process having been executed on Samuel C. Roane, district attorney, on the 24th of November, 1827, he filed an answer in behalf of the United States, denying the facts and allegations in the bill, and alleging that grants could only be made legally to persons actually residing in the province of Louisiana; that Samperyac, in whose name the bill was filed, was a fictitious person without actual existence; or that if he ever existed he was a foreigner, or then dead, and made no transfer, or assignment, of the claim in his lifetime; that he had no legal representative in existence; that there was no one now living, who was authorized to file this bill or prosecute this suit, and prayed that the bill might be dismissed. On the 19th of December, 1827, the district attorney moved to continue

the cause until the next term, principally on the ground that there were many cases pending in the court, similar in all respects, and involving the same principles, and with regard to which the United States desired to procure evidence if any existed. The court denied the motion, and the district attorney excepted, and the court signed and sealed his bill of exceptions.

The testimony in behalf of the complainants was the exhibits to the bill already referred to, and the deposition of John Hebrard, of the parish of Ouchita and state of Louisiana, taken in open court on the 19th of December, 1827. He testified that he was about seventy-one years old; that he was alcalde in the province of Louisiana, under the Spanish government, from 1789 to 1791, under the appointment of Miro, governor of said province; that he was commandant in Catahoola from 1797, under the appointment of Manuel Gayoso De Lemos, governor of said province, until the country was transferred to the United States; that he was often in the executive offices of those governors during their administration; had often seen them write, and from his official situation had occasion for a continual correspondence with each of them during the times they were respectively governors of said province, and that he was well acquainted with their handwriting; that he had examined the signature to the grant in this case, and found it to be in the proper handwriting of Miro, governor of said province at that time. He further testified, that the grant in this case was in the most usual form and mode of granting lands by the said governors, and would have been perfected into a title in form under the Spanish government; that lands thus granted were considered and treated by the government and the grantee as established titles, and were to be surveyed or not as the grantee chose; that a concession or order of survey, calling for lands fronting on watercourses, were to be run off, when surveyed, as follows: commencing from forty to sixty feet back from the highest high land, after passing all overflowed land if any in front, and the grantees were authorized to locate the grant on entirely good, arable land, so as neither to include inundated nor barren land, unless they chose to do so. He further testified, that the command of Arkansas commenced on the Mississippi river, at a place called Little Prairie, about forty miles below New Madrid, and fronted on the Mississippi down to Grand Point Coupee, now called Lake Providence, in Ouchita parish, state of Louisiana, and extended back west so as to include all the waters which emptied into the Mississippi from the west, between those points. He stated, on cross-examination, that he knew Bernardo Samperyac; that he resided in the province of Louisiana at the date of the order of survey, 11th October, 1789, and was then living on Red river in Natchitoches parish, Louisiana;

that in granting lands to individuals, the consideration frequently was for services rendered the government, but more frequently to induce population; that any man from any quarter could and generally did obtain concessions and orders of survey; that the Spanish governors kept records of grants, but that the destruction of the offices at New Orleans by fire, in 1792 or 1793, destroyed the greater part of the records, and that a great many more were said to have been purloined and taken off, about the change of government by officers who had been attached to the Spanish executive offices; that, as to granting lands, the governors-general of Louisiana were limited as to jurisdiction and quantity. They were authorized and empowered by the laws, usages, and customs of the Spanish government to grant lands not exceeding one league square, in the province of Louisiana, which commenced at the mouth of the Mississippi river, and extended back so as to include all Upper and Lower Louisiana.

On the same day, the 19th December, 1827, the superior court, held by Benjamin Johnson and William Trimble, judges, on the foregoing testimony, decreed the confirmation of the said grant to Bernardo Samperyac, as for four hundred arpens of land, and the decree was recorded, and no appeal taken from it by the United States within one year. One hundred and thirty other cases before the same court, against the United States, in the names of different claimants, were confirmed for four hundred arpens of land each, on the same testimony, and decrees entered and recorded, and from which no appeals were taken. On the 14th of February, 1828, Samperyac transferred his claim by deed to John J. Bowie; and in December, 1828, Joseph Stewart, it was admitted on the part of the United States, purchased the claim from John J. Bowie by deed, for a valuable consideration, and in good faith; by virtue of which purchase, Stewart entered at the Little Rock land-office, on the 13th of December, 1828, the north-east quarter of seventeen, the east half of south-east quarter of seventeen, and the west half of north-east quarter of thirteen; all in township eleven south, of range twenty-six west, containing 320 acres, relinquishing the overplus of twenty acres; and obtained the certificate of entry of Bernard Smith, the register thereof. On the 10th of April, 1830, the United States, by Samuel C. Roane, their attorney for the territory of Arkansas, filed in the superior court, by leave thereof, their bill of review against Bernardo Samperyac, setting out the proceedings in the foregoing case, and alleging that the original decree was obtained by fraud and surprise; that the petition and order of survey were forged; that Hebrard, the witness in the cause, committed the crime of perjury; that the order of survey was never signed by Miro, governor of Louisiana, as it purported to have been, and that this fact had come to the

knowledge of the said district attorney since the decree was entered; that Samperyac was a fictitious person, and never had existence; that the district attorney had discovered new and important record evidence, of the existence of which he was not aware, and which was not within his control at the hearing of the cause, and which could be procured, if a rehearing was allowed; and praying that said decree and proceedings might be reviewed and reversed and annulled. Bills of review were filed in each of the other cases, at the same time setting forth the same facts.

On the 8th of May, 1830 [4 Stat. 399], congress passed an act entitled "An act for further extending the powers of the judges of the superior court of the territory of Arkansas, under the act of the 26th day of May, 1824, and for other purposes," continuing in force that act so far as it related to claims within the territory of Arkansas until the 1st of July, 1831, "for the purpose of enabling the court in Arkansas having cognizance of claims under the said act to proceed by bills of review filed, or to be filed, in the said court on the part of the United States, for the purpose of revising all or any of the decrees of the said court in cases wherein it shall appear to the said court, or be alleged in such bills of review, that the jurisdiction of the same was assumed in any case on any forged warrant, concession, grant, order of survey, or other evidence of title; and in every case wherein it shall appear to the said court, on the prosecution of any such bill of review, that such warrant, concession, grant, order of survey, or other evidence of title. is a forgery, it shall be lawful, and the said court is hereby authorized to proceed, by further order and decree, to reverse and annul any prior decree or adjudication upon such claim; and thereupon such prior decree or adjudication shall be deemed and held in all places whatever to be null and void, to all intents and purposes. And the said court shall proceed on such bills of review by such rules of practice and regulations as they may adopt for the execution of the powers vested or confirmed in them by this act." 8 Laws U. S. 297, 298.

Samperyac was proceeded against as an absent defendant, after the return of the process that "he was not to be found in the territory of Arkansas." On the 28th of October, 1830, Joseph Stewart was permitted to file his answer, and become a defendant, which was excepted to on the part of the United States, and a bill of exceptions signed and sealed by the court. On the same day, a decree pro confesso was entered against Bernardo Samperyac, he having failed to appear and answer the bill. The answer of Stewart denied the frauds and forgeries alleged in the bill, and averred that if there was any fraud, corruption, or forgery, he was ignorant of it, and that he

bonâ fide purchased the claim, for a valuable consideration, from John J. Bowie, by deed, and had entered the same at the Little Rock land-office, and ought not to be divested of the land so entered; and that the said decree, being for less than five hundred acres, and not having been appealed from within one year, was final and conclusive, and could not be annulled or set aside. The cause was set down for final hearing at the next term; and, on motion of the district attorney, it was ordered that he have leave to withdraw from the record files of the court the original Spanish paper in this case, for the purpose of taking depositions, the Hon. James Woodson Bates, one of the judges, dissenting. The clerk was required to retain a copy of the paper.

On the 26th of January, 1831. the cause came on for final hearing, on bill, answers, exhibits, and testimony; and was argued by counsel until the 1st of February, 1831. and was then submitted, and by the court taken under advisement. On the 4th of February, 1831, the defendants filed their written motion that the court submit the question of forgery vel non, of the order of survey, to the decision of a jury; and this motion was taken under advisement. The testimony adduced under the bill of review is sufficiently referred to in the opinion of the majority of the court, and need not here be recapitulated.

On the 7th of February, 1831, the above motion was overruled by the following opinion of the court:—

PER CURIAM.—We are of opinion that the motion to award a feigned issue in this case should be overruled, for the following reasons:—(1) Because it rests in the sound discretion of the chancellor to award a feigned issue or not; and where the truth of the facts can be satisfactorily ascertained by the chancellor, without the aid of a jury, it is his duty to decide as to the facts, and not subject the parties to the expense and delay of a trial at law. Dale v. Roosevelt, 6 Johns. Ch. 255. (2) Because the chancellor, when he directs such issue, does it upon the ground that the evidence produced before him in the record is not sufficient to enable him to arrive at a satisfactory conclusion; he, therefore, directs the facts to be tried by a jury. for the purpose of collecting additional evidence; which additional evidence, when so collected, the chancellor considers in connection with that already existing in the records of the chancery court. Bootle v. Blundell, 19 Ves. 500; 1 Archb. Prac. 347–349. (3) Because the verdict of the jury upon such feigned issue is not conclusive upon the chancellor; he may have it tried again and again, if these verdicts are not agreeable to his sense of justice, or he may even decree contrary to a verdict, if he thinks proper. Morris v. Davies, 14 Serg. & L. 534. (4) Because the bill in this case has

been taken for confessed, and every distinct and positive allegation in it must be taken as true. Williams v. Corwin, 1 Hopk. Ch. 471. Motion overruled.

On the 7th of February, 1831, the court decreed that the former decree in favor of Bernardo Samperyac against the United States, for four hundred arpens of land, pronounced and recorded at the December term of this court in 1827, be reversed, annulled, and held for nought; and that Stewart pay his own costs. Decrees of reversal were pronounced in the other cases.

Samuel C. Roane, Dist. Atty., and William S. Fulton, for the United States.
Chester Ashley, Robert Crittenden, William Trimble, and William Kelly, for defendants.

Before JOHNSON, ESKRIDGE, BATES, and CROSS, JJ.

JOHNSON, J.—This is a bill of review, filed by Samuel C. Roane, attorney of the United States for the territory of Arkansas, for and on behalf of the United States, to revise, reverse, and annul a former decree of this court, pronounced and recorded at the December term, 1827, in favor of Bernardo Samperyac, for four hundred arpens of land. The substantial allegations in the bill of review are, that the decree is erroneous, and was obtained by fraud and surprise; that the original petition, or requite and order of survey exhibited in this case, are forged and corrupt; and that the order of survey was never signed by Miro, governor of Louisiana, as the same purports to have been; and that this fact has come to the knowledge of the said district attorney since said decree was entered of record; that Bernardo Samperyac is a fictitious person, and never had an actual existence; that if he ever did exist, he was dead at the time of exhibiting his bill; that John Hebrard, upon whose testimony the decree was made, committed the crime of perjury in giving his testimony; and that the statements sworn to by him upon the hearing of this cause, as set forth in his deposition, are false and corrupt; that the original petition and order of survey in this case, shows upon its face, that it was not made as early as the year 1789, but appears to have been made long since, and that the former decree of this court was obtained by fraud, covin, and misrepresentation, in violation of the principles of equity and of law.

The district attorney, for and on behalf of the United States, avers and says, that since the decree was made in this case, he has discovered new and important record evidence, which was not within his control, and the existence of which he did not know, and had not time to procure at the hearing of this cause; all which he believes he will be able to procure and exhibit upon the final hearing.

The first question made and argued at the bar, which will be considered, relates to the power conferred on this court by the act of congress of the 26th May, 1824, entitled "An act enabling the claimants to land within the limits of the state of Missouri and territory of Arkansas, to institute proceedings to try the validity of their claims."

It is contended by the counsel for the defendants that the act of 1824 constituted a special tribunal, with limited and restricted powers; that full chancery powers were not conferred; that this court possessed no greater powers than have been heretofore delegated to boards of commissioners, created by acts of congress, to decide upon claims similar to those now pending in this court; that this court cannot entertain a bill of review, because the authority to do so is not given by the act of 1824. That this court, sitting as a court for the adjudication of French and Spanish claims, possesses no power not delegated and conferred by the several acts of congress upon that subject, we are ready to admit.

To ascertain the extent of the power and jurisdiction of this court, let us examine the act of 1824. That act provides, that it shall be lawful for certain claimants to present a petition to the district court of the state of Missouri, setting forth their claims as pointed out in the act; praying in said petition, that the validity of such title or claim may be inquired into and decreed by said court; and the said court is authorized and required to hold and exercise jurisdiction of any petition presented in conformity with the provisions of the act, and to hear and determine the same on the petition, in case no answer be filed, after due notice or on the petition and answer of any person interested; and the answer of the district attorney of the United States, where he may have filed an answer, according to the evidence which may be adduced by the parties, in conformity with the principles of justice, and according to the laws and ordinances of the government under which the claim originated; a copy of the petition to be served on any adverse claimant, and on the district attorney of the United States when the government is interested in the defence. The act further provides, that any petition which shall be presented, shall be conducted according to the rules of a court of equity, except that the answer of the district attorney of the United States shall not be required to be verified by his oath, and tried without any continuance, unless for cause shown; and said court shall have full power and authority to hear and determine all questions arising in said cause, relative to the title of the claimants, and, by a final decree, to settle and determine the validity thereof, according to the laws of nations, and all other questions properly arising between the claimants and the United States; and the court may, at its discretion, order disputed facts to be found by a jury according to the prac-

tice of said court, when directing issues in chancery before the same court; and in all cases, an appeal to the supreme court of the United States is allowed, within one year from the rendition of the judgment or decree, the decision of which court shall be final and conclusive between the parties; and should no appeal be taken, the judgment or decree of the said district court shall, in like manner, be final and conclusive. By the 14th section of the act of 1824, it is enacted, "that all the provisions of that act shall extend to and be applicable to the territory of Arkansas, and for the purpose of finally settling and adjusting the title and claims to land derived from the French and Spanish governments, the superior court for the territory of Arkansas, shall have, hold, and exercise jurisdiction in all cases, in the same manner, and under the same restrictions and regulations, in all respects, as by this act is given to the district court for the state of Missouri."

The question arises under the foregoing act, whether this court has been clothed with full and complete chancery jurisdiction and power; in adjudicating upon these claims; or whether it has been invested with a limited and restricted authority, capable of performing nothing which is not expressly delegated by the act, resembling rather a board of commissioners than a court of equity? Upon the best reflection which we have been able to bestow upon the subject, we entertain little doubt that the act of 1824 intended to confer, and does confer, upon this court, the full and ample power of a court of chancery. Instead of creating a special tribunal, a board of commissioners to decide and report upon claims like these, congress has referred them to the decision of a court, possessed of common law and chancery jurisdiction; a court invested with a part of the judicial power of the United States.

The cases, when brought before this court, are to be conducted according to the rules of a court of equity. This court, then, possessing both chancery powers and common law jurisdiction, is required to try these cases on the chancery side of the court. The fact that the cognizance of these claims is given to a court possessed of full and ample equity jurisdiction, with the injunction to try the cases according to the rules of a court of equity, goes far to prove that congress intended to refer them to the judiciary, and allow the United States to be sued before her own courts, that a final termination might be put to these demands upon her justice. The provision for an appeal from the decision of this court to the supreme court of the United States, by either party, strongly evinces the intention of congress that these claims should receive their adjudication by the judiciary of the United States. If, then, congress intended to refer them to the judiciary, can it be reasonably inferred that they intended to limit the general pow-

ers of the court to which the reference is made? We think not. The act, in terms, does not limit the jurisdiction of this court; and we are not to infer a limitation unless it be expressed, or arises from a necessary implication. If we are correct in affirming the proposition that the act of 1824 authorizing certain claimants to bring suit against the United States, on the equity side, possessed of full chancery power and jurisdiction, it follows, that a bill of review will lie in this court, unless there be something in the act itself forbidding it.

It has been urged that that part of the act which says that the judgment or decree of this court, unless appealed from in one year, shall be final and conclusive, necessarily precludes the idea of a bill of review. We entertain a different opinion. The provision just referred to, relates to the time in which an appeal may be taken. It says nothing about a bill of review, or rehearing. Each of these modes of revising the decrees of this court, according to the practice in chancery, is left untouched, and stands precisely as they existed had no time been limited for an appeal. The court entertains a bill of review, in virtue of the chancery jurisdiction conferred by the act of congress by which it was created, and possessing that power previous to the act of 1824, continued to possess it, with the authority to apply it to these cases, for the adjudication of which the latter act was passed. It is, however, further contended by the counsel for the defendants, that, as the bill of review in this case was filed upwards of two years subsequent to the final decree in the original cause, and more than one year after the time allowed for an appeal had elapsed, this remedy is barred by length of time. In the case of Thomas v. Harvie, 10 Wheat. [23 U. S.] 146, the supreme court of the United States held that a bill of review, for error apparent in the decree, is barred by length of time, unless it is filed before the time limited for an appeal; but, in the same case, the court expressly reserved the question, whether a bill of review, founded upon matter discovered since the decree, is in like manner barred by the lapse of the time limited for the appeal. That question is directly presented in this case, and calls for our decision. We have bestowed upon it all the reflection of which we are capable; and the conclusion to which we have arrived is, that a bill of review, founded on the discovery of new matter after the decree, ought not to be barred by the lapse of one year, the time limited in these cases; nor do we think it ought to be barred by the lapse of two years and four months, the time between the former decree and the filing of this bill. The reasons assigned by the supreme court, in the case cited, for applying as a bar to bills of review for error apparent on the face of the decree, the time limited for an appeal, do not, in our judgment, apply to the case of a bill of re-

view, founded on new matter, discovered subsequent to the decree. Judge Washington, in delivering the opinion of the court, says, "that courts of equity, acting upon the principle that laches and neglect ought to be discountenanced, and that in cases of stale demands, its aid ought not to be afforded, have always interposed some limitation to suits brought in those courts;" and the decision was, that, although bills of review are not strictly within the statute of limitations, yet courts of equity will adopt the analogy of the statute in prescribing the time within which they shall be brought.

In the case of a bill of review for new matter recently discovered, no laches or neglect can, we think, be properly imputed to the party filing the bill. It is allowed only on the ground of his ignorance of the existence of the new matter before the former decree; and it is incumbent on him to file his bill in a reasonable time after the discovery is made; all this is alleged in the present bill. The bill could not be filed within one year after the decree, because the new matter had not then come to light, but was subsequently discovered. If, then, laches or neglect are not imputable, has so great a time intervened that it may justly be denominated a stale demand? Two years and four months can scarcely be considered in that light. It would not bar an action of assumpsit upon a parol contract, and cannot be considered an unreasonable delay in bringing a bill of review. In England, twenty years is allowed; and in the case decided in 10 Wheat. [23 U. S.] 146, before cited, five years was allowed.

We do not think that, to a bill of review for new matter, no lapse of time ought to bar the remedy. Upon the principle of repose, we think the lapse of a reasonable time ought to present a bar; what that reasonable time should be considered, and it is well settled to be in the second discretion of the chancellor, it is unnecessary for us to decide, since we are clearly of opinion that two years and four months is not an unreasonable time for filing a bill of review. Whether the principle settled by the supreme court of the United States, in several cases, that laches are not imputable to the government, ought to apply in this case, we need not decide. The second inquiry which arises in this case, and which has been ably argued at the bar, is, whether a case is made out for a bill of review according to the established principles of equity.

The material allegations in the bill have already been stated, by which it appears that the main and principal ground relied upon for a review, is the discovery of new matter since the making the former decree. The only allegation we deem material to notice is, that the original petition, or requite and order of survey on which the decree was based, is forged and corrupt, and was never signed by Miro, governor of Louisiana; and that this fact has come to the knowledge of the district attorney of the United States since the rendition of the decree, asked to be reviewed; and that he has, since the said decree, discovered new and important record evidence, which was not within his control, the existence of which he did not know, and had not time to procure, at the hearing of the cause.

The objections urged by the counsel for the defendants are, that this is a matter which was put in issue by the pleadings in this case before the former decree was pronounced and recorded; and having been once put in issue, a bill of review will not lie for the discovery of evidence relating to the matter put in issue previous to the decree; that a bill of review will lie only for error apparent in the decree, or for new matter subsequently discovered, which was not in issue between the parties. Let us examine this position. The ordinances of Lord Chancellor Bacon respecting bills of review, are generally referred to as good authority, and have never been departed from. 3 Atk. 26. The doctrine is there asserted that no bill of review shall be admitted except it contain either error in law, appearing in the body of the decree, or some new matter which has arisen after the decree, and not any new proof that has come to light after the decree was made; nevertheless, upon new proof that has come to light after the decree was made, which could not possibly have been used at the time when the decree passed, a bill of review may be granted.

According to the doctrine of the above ordinance, the present bill makes out a good case for a bill of review. New proof, important and material, none could be more so, is alleged to have come to light since the making and recording of the former decree, which could not possibly have been used at the hearing, because it was not known by the district attorney to have existence. This new proof is, that the title papers of the defendant are fraudulent and forged. But this fact is said to have been before put in issue. Admit it, for the sake of argument. What is the doctrine asserted by Chancellor Eldon in the case of Young v. Keighly, 16 Ves. 348. The ground of a bill of review, the chancellor says, is error apparent on the face of the decree, or of new evidence of a fact material pressing upon the decree, and discovered after publication in the cause. Again, he says: "As far as I can ascertain what the court permits with regard to bills of review upon facts newly discovered, the decisions appear to be on new evidence, which, if produced in time, would have supported the original case, and are not applicable where the original cause does not admit of the introduction of the evidence; as not being put in issue originally." The doctrine is to be found in Coop. Pl. 91. The author asserts "that it must be on new matter to prove what was before in issue, for a party cannot be entitled to a bill of review on new matter to prove a title which was not in issue." For this position he cites Cary, 82; Amb. 293. If these authorities are to be relied upon, they prove conclusively, that in the

present bill, a good cause is made out for a review. We are ready to admit, that in the two cases decided by the court of appeals of Kentucky, reported in Hardin's Reports, 342 and 454, a different doctrine seems to be established. But the rule as laid down by Chancellor Eldon, accords better with our views of what the rule ought to be, and accordingly we adopt it as intrinsically correct. But, admitting that the new matter must relate to something not before put in issue by the parties, still we think a case is made out for a bill of review.

It is certainly true that the district attorney, in his answer, denied all the allegations in the petition, and required the petitioner to produce proof of them; but, at the same time that he denied them, he stated that he was wholly uninformed as to their truth. It is like the answer of a guardian, denying the allegations of a bill on the ground of ignorance, whether they are true or false; and such answer has been held insufficient to dissolve an injunction. Apthorpe v. Comstock, 1 Hop. Ch. 143; Roberts v. Anderson, 2 Johns. Ch. 202. By this general denial of the title of the petitioner, no special fact in relation to that title was put in issue. The district attorney made no allegation that the title papers of the petitioner were fraudulent or forged. He could not make such an averment at the time he filed his answer, because he was wholly uninformed as to the authenticity of those papers, and, on that ground, required that they might be proved.

There was no controversy as to the fact whether those papers were genuine or forged; no conflicting testimony was introduced, and all the proof adduced before the court was by the petitioner. This surely cannot be such a putting in issue of the fact of forgery or not, as to preclude a reëxamination of that matter, when subsequently discovered. We suppose the judges of the court of appeals of Kentucky mean to say, that after certain material matters of fact have been put in issue, and evidence adduced by each party to that issue, and a decree rendered, a bill of review will not lie merely upon the discovery of additional testimony to the same point, unless that evidence consists of records, in which event they admit that a bill of review will lie. According, then, to the principles settled in Kentucky, a case is made out for a bill of review; for the present bill contains the allegations that important record evidence has been discovered conducing to prove that the title papers of the petitioner are false, fraudulent, and forged. The court of appeals of Kentucky, in the case of Respass v. McClanahan, Hardin, 346, say: "There is an important difference between the discovery of a matter of fact itself, which, though it existed at the former hearing, was not then known by the party to exist, or which was not alleged or put in issue by either party, and the discovery of new witnesses or proof of a matter or fact which was then known or

in issue. In the former cause, the party not knowing the fact, and it not being particularly in issue, there was nothing to put him on the search, either of the fact or the evidence of the fact, and therefore the presumption is in his favor, that, as the matter made for him, his failure to show the matter was not owing to his negligence or fault. They further say, after the most careful search, they cannot find one case reported in which a bill of review has been allowed on the discovery of new witnesses to prove a fact which had been before in issue, although there are many where bills of review have been sustained on the discovery of records or other writings relating to the title which was generally put in issue."

It cannot be affirmed that the forgery of the title papers of the petition was particularly put in issue by the former pleadings. The title only was generally put in issue, and, according to the authority just quoted, as record evidence in relation to that title is alleged to have been discovered, a clear case is made out for a bill of review.

If, then, this court possesses the jurisdiction to entertain a bill of review in the case now before the court, and a case is made out by the bill, according to the principles of equity, the next inquiry is, does the evidence adduced call upon the court to pronounce a decree of reversal? What is the evidence? First, the defendant, Samperyac, the original petitioner in whose favor the former decree was rendered, has failed to answer this bill, and, under a rule of this court, an order of publication was duly published in the Arkansas Gazette; and at the October term, 1830, of this court, the bill was taken for confessed as to the said defendant. The inquiry arises as to the effect of taking the bill for confessed. The doctrine is well settled, that when the allegations of a bill are distinct and positive, and the bill is taken for confessed, such allegations are taken as true without proof. That a decree pro confesso is like a judgment by nil dicit at common law. Williams v. Corwin, 1 Hopk. Ch. 471; 3 Atk. 468. In the case of Hawkins v. Crook, 2 P. Wms. 556, the bill alleged a decree to have been obtained by fraud. The decree assumes that the order to take a bill pro confesso admitted the facts charged as fraudulent, and the court plainly took them to amount to fraud, and without further proof, decreed the appropriate relief. The authorities clearly establish this principle, that if the allegations are of a nature so distinct and positive, that, taking them to be true, the court can make a decree upon them, it will, upon the order pro confesso, decree without proof. Where they are in their nature so defective or vague that a precise decree cannot be made upon them, proof must be adduced from the necessity of the case. No rule can be better founded in reason and propriety.

A refusal to deny where the party is legally bound to speak, is equal to an admission of

the charges made against him. What is admitted, need not be proved. The allegations are incontrovertibly established, when confessed by him against whom they are made. This is the doctrine applicable to original bills; and we have, in our researches, been able to find no case where the doctrine has been applied to bills of review. Perhaps it may be because no such case exists, and that this is the first where a bill of review has ever been taken pro confesso. But the principle applies with equal force and propriety to the latter as to the former. The allegations of this bill are, that the title papers are forged and spurious, and that the witness who proved them committed perjury. These allegations, when admitted, destroy the evidence upon which the former decree was based, are distinct and positive in their nature, and justify a decree without additional proof. But admitting that the doctrine applicable to original bills, in relation to the effect of taking a bill pro confesso, ought not to be applicable to bills of review, still we are of opinion that the evidence adduced in this case is full and conclusive to prove that the title papers upon which the former decree was based are forged, fraudulent, and spurious.

Let us advert to the evidence: Hilary B. Cenas, register of the land-office at New Orleans, states, in his deposition, that he has instituted a careful search among the Spanish records under his charge, particularly in a book entitled "Register de los Primeros Decretos de Concesion"; in which book it was customary to enter any order of survey, as it was first made, from the year 1786 up to 1799, inclusive, and could not find any order of survey of lands in favor of, or granted to, Celestine Armon in the district of Arkansas. He further says that he has examined the form of orders of survey, as sworn to by Judge Tessier and Jean Mercier, the register of mortgages in New Orleans, and found it to correspond with the orders of survey of record in his office; that he has compared the signatures affixed to orders of survey, upon which Messrs. Tessier and Mercier have given their depositions in the cases of the United States against the persons named in said depositions, and that he verily believes that they are false and counterfeit. By consent of parties, this deposition was read in this case, to prove the same facts in relation to the order of survey in favor of Samperyac. Isaac T. Preston, late register of the land-office at New Orleans, asserts that he has examined the papers annexed to the depositions of Jean Mercier and Charles Tessier, in the cases in which they have given their depositions before the Honorable Gillen Preval, purporting to be Spanish orders of survey. The signatures are not in the handwriting of Governor Miro or Gayoso, as they purport to be. Deponent is well acquainted with the signatures of those governors, having seen their genuine signatures to many different records. Deponent further says, that said papers are not in the form in which Spanish orders of survey were given, but that the form annexed to the depositions of Mr. Tessier and Mr. Mercier, were adopted in all orders of survey, except when the nature of the place to be surveyed required a different form. He further states, that he has seen the deposition of Hilary B. Cenas, register of the land-office at New Orleans; and that deponent, when register of the same office, made a similar search with the same result. Charles Tessier deposes that he was a clerk in the office of the late Spanish government, from the commencement of the year 1790 to the end of the year 1802; that he was acquainted with the handwriting of Governors Miros and Manuel Gayoso De Lemos, from seeing them write frequently; and says, positively, that the signature of Miro presented to him, and appended to the order of survey in this case, and which has been signed by me, nevariator is not in the handwriting of said Governor Miro; that the decree or order of survey is not in the form used and prescribed in such case, nor is it recorded, as was the usual practice, in granting lands by the governor; that the practice was to insert at the foot of the said order, the word "Reg'd," with the flourish of the recording clerk; further, that the spelling of the said decree is not according to the rules of Spanish orthography, and that the clerks, whose duty it was to write such orders, were all good Spanish scholars, and would not have been permitted to use such spelling in any official business; that the handwriting of the aforesaid order of survey is not that of any of the clerks that were, at that time, employed in that department of the government, the deponent being well acquainted with the handwriting of all the clerks who wrote in the office during the time he was in the employ of the government, and he is also acquainted with the handwriting of those that preceded him for many years. This witness further states, that he has no recollection of John B. Hebrard, Harea Devere, and Lemuel Masters, and is positive that these men were not familiar in the office of the Spanish government, and never known or seen in that office; that he does not know the handwriting of the order of survey in this case; that it is not in the handwriting of any of the clerks that ever were employed in the office of the Spanish government then existing.

Jean Mercier, a clerk in the office of the late Spanish government in Louisiana, from 1792 to 1801, deposes to the same facts, in all respects, testified to by Charles Tessier, and which it is unnecessary to repeat.

Antoine Cruzat, Sen., deposeth, that he was employed as an officer of the regiment of Louisiana, in the office of Governor Manuel Gayoso De Lemos, all the time he was governor of Louisiana under the Spanish government. That he had frequent opportunities to see and examine the signature of Governor Miro, and to see him also sign his name. He further says that he is well acquainted

with the handwriting and signature of all the clerks of the office of the said governors; and that he had no hesitation in saying, that the signatures of Miro and Gayoso, appended to the orders of survey in which Charles Tessier and Jean Mercier have given their depositions before Judge Preval, pursuant to several commissions from the superior court of the territory of Arkansas, are not genuine, as well as the handwriting of the orders of survey. That the spelling of said orders of survey is incorrect, and that no clerk would have been permitted to use it; that the form of the orders of survey, as given by Mr. Mercier and Mr. Tessier, is the only true and correct one; that he has never known any men by the name of John B. Hebrard, David Devere, and Lemuel Masters; and that he is confident they have never been seen in the office of Governors Miro and Manuel Gayoso De Lemos, at New Orleans.

The deposition of Martin Durald, late register of mortgages in New Orleans, taken in a similar case to the one now before the court, in which the United States is plaintiff, and Martin Durald defendant, has been read as evidence in this case, by consent of parties. He deposes that he was born in Louisiana, and has never had any grant nor any order of survey for any land in the territory of Arkansas; that his father was of the same name with himself, and that, to the best of his knowledge, his father has never had any land in the territory of Arkansas; that he is well acquainted with all the names of the French and Spanish inhabitants of Louisiana, as having kept a public office in New Orleans; and that he knows no person, except his father and himself, of the name of Martin Durald; that he had a brother by the name of Joseph V. Durald, and that, to the best of his knowledge, his said brother never had any land in the territory of Arkansas.

From the testimony, it is manifest that the order of survey in this case is not to be found recorded in the record book at New Orleans, in which it was usual and customary to record any order of survey made from 1786 to 1799. The same fact is also proved in relation to every case amounting to upwards of one hundred, now pending before this court, upon bills of review.

Tessier, Mercier, Preston, and Cenas, all depose to this fact; Tessier, Mercier, Cruzat, all of them well acquainted with the handwriting of Governor Miro, and having frequently seen him write, swear that the name of Miro, signed to the order of survey in this case, is not in his handwriting, and therefore not genuine. Cenas, the present register, and Preston, the late register of the land-office at New Orleans, both swear that they have seen many genuine signatures of Governor Miro; and from the comparison with the present order of survey, the signature is not in the handwriting of Governor Miro. Tessier, Mercier, and Cruzat, depose that they are well acquainted with the handwriting of all the clerks who wrote in the Spanish governor's office, at New Orleans, and that the order of survey in this case, is not in the handwriting of any clerk who ever wrote in the said office, and that the form of the order of survey in this case, is not in the form used by the Spanish government; Cenas and Preston also swear to this latter fact; Tessier and Mercier swear that Hebrard was never seen in the governor's office, at New Orleans.

The fact that the name of Samperyac, the original petitioner and defendant to this bill, is signed in a good handwriting to the petition to the governor for a grant, and that his mark is used in the deed of transfer to John J. Bowie, is also in proof.

It is further in proof, that the defendant, Samperyac, has never made his personal appearance in this court, nor has one of the original claimants, amounting to one hundred and seventeen, ever appeared here, except by John J. Bowie, their agent, and the counsel employed by him; and the counsel admit that they have never seen one of the original claimants in whose favor the former decrees of this court were made. The evidence upon which the former decree was made, is the deposition of John B. Hebrard. In deciding upon this testimony, we think there is no rational ground to doubt, we are entirely satisfied, and believe it to be abundantly manifest, that the order of survey, upon which the former decree was made, is fraudulent, forged, and counterfeit; and that Samperyac himself is an ideal, fictitious being, and never had an existence except in name. The fact that Samperyac, nor any of the other claimants have ever appeared here, or been seen by their counsel employed for them; that no one of them has filed an answer in these bills of review; that their title papers upon which the former decrees of this court rested, are not to be found of record where such papers were generally and usually recorded; that their title papers are not in the form used at the time, by the Spanish government, in making concessions of land; that they are misspelt, and above all, that they have been proven by the testimony of three or four witnesses, who stand above suspicion, having the best opportunity of being well informed, to be counterfeit, forged, and spurious, speak a language not to be misunderstood, and calculated to produce the strongest conviction, that the order of survey, on which the former decree is based, is a forged and spurious paper, and, consequently, that the former decree of this court ought to be reversed, unless there is some other circumstance in the case to prevent it. There is, however, another defendant in this case, besides the original petitioner. Joseph Stewart, at a former term, appeared, and, on his motion, was admitted a defendant to this bill of review, and has filed his answer. In it he alleges that he is an innocent purchaser, without notice, for a

valuable consideration, of the land decreed by a former decree of this court; that he purchased from John J. Bowie, who, he alleges, purchased from Samperyac, the original petitioner, and exhibited the deeds of transfer or assignment. He denies all the allegations in this bill, of fraud, forgery, and perjury, but admits his entire ignorance of these matters, and prays that his interest may be protected by this court.

The question arises, what effect is this answer entitled to have in the decision of this cause? The defendant Stewart, in our judgment, does not occupy the attitude of an innocent purchaser without notice, so as to stand on any higher ground than the defendant Samperyac himself. The interest which he has purchased in the land decreed by this court, is an equitable and not a legal right.

It is well settled, that a judgment or decree is not assignable at law, so as to vest a legal title in the assignee. The act of congress of 1824 does not authorize the assignment or transfer of the decree of this court; and, under that act, the land decreed to the claimant could be entered or located only in his name, or in the name of his legal representatives, in case of his death, and the patent could issue only to the claimant or his legal representatives, not to his assignees. Stewart, then, can only be considered as the purchaser of an equity; and it is an established principle, that a purchaser for a valuable consideration without notice, in order to protect himself, must be clothed with the legal title, and not a mere equity. 2 Brown, Ch. 66; 2 Madd. 258; 1 Atk. 571; 3 Atk. 377. The defendant Stewart, having only an equitable title under the former decree of this court, takes it subject to all equity which attached to it in the hands of his assignor. It cannot be asserted that Stewart is a purchaser under the former decree of this court. This can be true only when there has been a judicial sale, in which case the purchaser is protected, though the judgment or decree is erroneous. Upon this ground, alone, we think it is obvious that the defendant Stewart stands on no other or different ground than the original petitioner, in whose favor the former decree was made. 2d. If, however, we are mistaken in this position, still we think the defendant Stewart is not entitled to be protected as an innocent purchaser without notice, on the ground that the transfer from Samperyac to John J. Bowie is a forgery. The evidence establishing this fact will be briefly detailed. The transfer or deed from Samperyac to John J. Bowie, of the land decreed by the former decree of this court, now claimed by Stewart, bears date on the 14th day of February, 1828, and is attested by Henry Hobbs and John Cook, and proved by the said Cook before John Williams, as justice of the peace in Clark county in this territory. By consent of parties, about sixty-six deeds of transfer from the original claimants, in whose favor this

court have made decrees, all of which are now pending in this court upon bills of review, and are similarly situated with the case now under consideration, have been filed as evidence in this cause.

Twenty-four of those transfers, from the original claimants, are made to John J. Bowie, attested by John Cook and another name. The first of these transfers bears date on the 29th day of December, 1827, in a few days after the decree was entered of record. The second bears date on the 18th January, 1829; the third on the 19th; the fourth on the 21st; the fifth on the 24th of the same month and year. The sixth bears date on the fourth February, 1828; the seventh on the 6th; the eighth on the 8th; the ninth and tenth on the 9th; the eleventh on the 10th; the twelfth and thirteenth on the 11th; the fourteenth on the 12th; the fifteenth on the 13th; the sixteenth on the 20th; the seventeenth, eighteenth, and nineteenth on the 21st; the twentieth on the 22d; the twenty-first on the 23d; the twenty-second on the 28th; the twenty-third and twenty-fourth on the 29th February, 1828. These twenty-four transfers, one of which is the transfer in this case, purport to have been executed by the original claimants, in whose favor the decrees of this court were made to John J. Bowie, are all attested by John Cook and another, and certified by John Williams, a justice of the peace in this territory, to have been proved before him by John Cook, the subscribing witness.

How does it happen that this witness, John Cook, should have been present to witness the execution of twenty-four deeds from different persons to John J. Bowie, and most of them on different days? Could it have been necessary that Bowie should have employed this Mr. Cook to travel round with him to become a witness to their execution? Could Bowie have procured witnesses residing near these claimants to attest their deeds or transfer to himself? How does it happen Bowie is so fortunate as to find these original claimants so soon after the decree of the court was made? One of them he found in a few days after the decree, in a shorter time than would be required to travel beyond the limits of the territory. Having been fortunate in the commencement, his good fortune never seems to desert him until he obtains all the transfers. On the 4th February he finds one of them; one of them on the 6th; he is equally fortunate on the 8th; on the 9th he finds two, and on the 11th his efforts are still crowned with greater success, he finds three; on the 23d of the same month he finds three others; and by the 29th February, he discovers all of them. Thus it would seem that these original claimants, not one of whom can now be found to answer these bills of review, these men whom the counsel employed by John J. Bowie to advocate their rights, never saw; not one of whom are proven to be liv-

ing, or that they ever did exist. These are the men whom John J. Bowie finds residing so near each other, that he could obtain the deeds of three of them in one day, and find all of them in little more than one month after the decrees. If, however, we could believe all this, is it not passing strange that Mr. Cook, whom nobody knows, should have happened to be present at all these various times and places ready to attest these transfers from the original claimants to John J. Bowie? Unless we indulge the presumption, that Bowie employed this Mr. Cook to go along with him to attest these deeds, for which we can see no reasonable motive, we are unable to account for his presence whenever wanted or called for by Bowie. Bowie must have had a talisman, possessed of the magical power of Aladdin's lamp, by which he calls up, at his bidding, this omnipresent witness. We have no doubt that this witness, like the genius in the Arabian tales, having performed the office for which he was invoked, has vanished into air, and disappeared for ever. In addition to these twenty-four deeds of transfer, thirty other deeds of transfer or assignment from the original claimants to John J. Bowie and other persons, are by consent exhibited as evidence in this cause; all these deeds are attested by Lemuel Masters and other names, and certified by J. Williams, a notary-public in Louisiana, to have been proved before him by Lemuel Masters on the 29th day of February, 1828. The two first bear date on the 10th January, 1828; the third and fourth bear date on the 20th; the fifth and sixth on the 21st; the seventh on the 24th; the eighth on the 25th; the ninth and tenth on the 26th; the eleventh on the 27th; the twelfth on the 28th; the thirteenth and fourteenth on the 29th January, 1828; the fifteenth and sixteenth bear date on the 2d day of February, 1828; the seventeenth on the 9th; four more on the 10th; one on the 11th; one on the 13th; one on the 21st; two on the 22d; one on the 25th; one on the 26th; one on the 27th, and the remaining three on the 28th February, 1828. Lemuel Masters, the witness who proves these deeds, is not an ideal being, but is one of the three witnesses who proves the original claims, and on whose evidence the former decrees of this court were made. This circumstance adds nothing to his credit. Why should one of these witnesses to the original claims, brought here by John J. Bowie, which fact is known to this court, he being the only person who appeared here as agent of the claimants, have been selected to travel round and attest the deeds of transfer from these claimants? All the remarks made in relation to the twenty-four transfers apply with equal force to the thirty just named. Can it be believed that Lemuel Masters could find eighteen of these original claimants in one month, and four of them in one day? If they resided so near each other, why have not one of them answered these

bills? Why has no deposition been taken to prove that any one of them ever had an existence? Why, in short, has not John J. Bowie himself, answered these bills in the character of an innocent purchaser?

The defendant Stewart claims through him, and the answer of Bowie might be received upon the same ground. This circumstance is pregnant with proof that these transfers are fraudulent and base forgeries, and that the original claimants never existed except in name. There is another peculiarity about these transfers calculated to throw discredit upon them. It is this: in thirteen of these deeds, it is manifest, from an inspection, that the name of one of the witnesses thereto is written in the same handwriting with the body of the deed, and in the same ink. It is not usual or common for a witness to a deed to be called on to write the deed itself; and as the witness is never after heard of, the presumption is very strong that he, too, lives only in name. There are also twelve other deeds of transfer filed by consent, as evidence in this cause. We will not waste our time in remarking upon them. To pursue the subject further, would be worse than useless. In investigating frauds like these, the mind sickens and the feelings revolt. From a review of all the evidence in this case, we entertain no doubt that the transfer in this case, which purports to have been made from Bernardo Samperyac to John J. Bowie, is false and forged; and, consequently, upon that ground also, the defendant Stewart cannot be permitted to occupy the attitude of an innocent purchaser, fairly and bona fide, from Bowie. But his recourse is upon Bowie, of whom he purchased; and he cannot stand upon other and different ground than Bowie himself. The act of congress of the 26th May, 1824, from which this court derives its authority to decide in these cases, has been continued in force by several subsequent acts, the last of which was passed on the 8th May, 1830. That act has expressly given the power to this court to entertain bills of review in these cases, and to reverse the former decrees of this court, if, upon a revision, it shall appear that those decrees were based upon forged title papers.

From the view we have taken of this case, it has not become necessary for us to consider the question made, and ably argued at the bar, whether congress have not, in the act of 1830, transcended the limits of sound legislation; and we withhold the expression of an opinion upon it, as we are satisfied that the act of 1824 referred the decision of these cases to this court, sitting as a court of chancery; and that, under the system of equity by which this court is governed, a power exists to entertain a bill of review in the present case.

BATES, J. I dissent from the opinion of the court, as delivered in this cause. I part

with my associates on the threshold, on the point of jurisdiction; and, therefore, in the brief opinion which I shall give for the grounds of my disagreement, I shall not find it necessary, or even proper, to touch the other points which have been raised and so ingeniously and elaborately argued. Obsta principiis, is a maxim dear to the lovers of sound government. I shall endeavor on this, as on all other occasions, to manifest my appreciation of its value. By the treaty negotiated by the United States, in 1803, with the French republic, for the acquisition of Louisiana, our government became bound, in good faith, to perfect certain obligations which the previous governments, Spanish and French, had contracted with their citizens or subjects. But this treaty guarantee had no stipulation as to mode, and the government does not recognize in the citizen a right to sue without its consent. This consent was given by the act of congress of May, 1824. Tribunals were created in the state of Missouri and territory of Arkansas to adjudicate claims to land founded on French and Spanish grants, of which tribunals this is one; a special and extraordinary tribunal, created by the law referred to. Under this law, and before this tribunal, the claimant instituted his suit, which, at its maturity, ripened to a decree in his favor.

The bill of review has been instituted to annul and reverse the decree, on the ground that the grant is a forgery, and the claimant a supposititious character. It is foreign to my purpose to inquire into the well-foundedness of these allegations, for, whatever the decision, in the view I take of the subject, it could lead to no practical result. I assume it as a postulate not to be questioned, that the government going into the courts, is to be tried only by the same rules, and have the same measure of justice meted out to it, that the law secures to ordinary parties litigant. The law of 1824 gave to the party against whom the final decree of this court should be given the right of appeal within one year from the time of its rendition. The appeal not applied for, the decree became final and conclusive. More than a year had elapsed before the filing of the bill of review in this case. I will not moot the point, whether a bill of review would lie at all: it is rendered more than superfluous from the obvious fact, that no revision of the decree, of any kind, was sought for within the year. But it is said that the congressional legislation of May, 1830, puts this question at rest, cures all defects, gives jurisdiction,—gives it, too, to defeat rights and destroy vested interests growing out of, and based on, a former act of congress. Such, it is true, is the import of the language of the law; but is it so? Can it be that the federal legislature has the constitutional competency so to do? We could expect to find such a doctrine prevailing only in the worst days of the most tyrannical governments.

It is a language that Sejanus may have whispered to Tiberius. It is a language that may hold at this day in the meridian of Constantinople and St. Petersburg, where the mandate of the sultan, or the ukase of the emperor, supersedes reason, subverts right, and abrogates law. It is a language repudiated even in constitutional monarchies; and it is a language which, if received here as orthodox, goes convincingly to prove that the liberty, of which we have so proudly boasted, has an existence rather in name than in essence. Yet, highly objectionable as I deem this law, I couple with that objection no ascription of motives. It was probably a work of much haste,—the principles it involves not pushed to their conclusions, and not seen in their practical results. I think I heard in argument that the principles of this act might be inoperative when sought to be brought to bear on the property and rights of the citizens of the states, but that congress had unlimited and illimitable power over the territories. This proposition scarcely requires the show of refutation; it is incompatible with the genius of our government, and is, as it regards this territory, palpably in violation of treaty stipulations. I cannot resist the conclusion that we have not cognizance of this case, and that the bill of review should be dismissed for want of jurisdiction. Decree reversed and annulled.

NOTE. From the decree in the foregoing case, the defendants appealed to the supreme court of the United States, and the case was argued at the January term, 1833, by Mr. Prentiss and Mr. White, for the appellants, and by Mr. Taney, attorney-general, and Mr. Fulton, for the United States, and will be found fully reported in 7 Pet. [32 U. S.] 222. At the same term, after stating the facts and pleadings, Mr. Justice Thompson delivered the opinion of the court, as follows:—

The objections which have been taken at the bar to this decree, may be considered under the following points:—(1) Whether, under the act of 1824, the court had authority to entertain the bill of review; and if not, then, (2) whether the act of 1830 is a constitutional law, and confers such authority. (3) Whether the proceedings on this bill of review can be sustained under the act of 1830. (4) Whether, admitting Stewart to be a bona fide purchaser of the claim of Samperyac, he is protected against the title set up by the United States.

1. We think it unnecessary to go into an examination of the questions which have been made under the first point. Although the act of 1824 directs, that every petition which shall be presented under its provisions shall be conducted according to the rules of a court of equity, it may admit of doubt whether all the powers of a court of chancery, in relation to bills of review, are vested in that court. And as the view taken by this court upon the other points renders a decision upon this unnecessary, we pass it over without expressing any opinion upon it.

2. The ground, upon which it has been argued that the act of 1830 is unconstitutional, is, that a right had become vested in Stewart before the act was passed; and that the effect and operation of the law is to deprive him of a vested right. To determine the force and application of this objection, it becomes necessary to look at the claim as it now appears

before the court. It is found, by the decree of the court below, and is admitted at the bar, that Samperyac is a fictitious person. That the petition, purporting to have been presented by him to Miro, governor of the province of Louisiana, and the order of survey, alleged to have been made thereupon, are forgeries. These are the only evidence of title upon which the original claim rests. And it is proved and admitted that the deed, purporting to have been given by Samperyac to Bowie, under whom Stewart claims, is also a forgery. The bill or petition filed in the original cause, alleges that the claim is secured by the treaty between the United States and the French republic, of the 30th April, 1803. This, however, has not been insisted upon on the argument here; and there is certainly no color for pretending that a claim, founded in fraud and forgery, is sanctioned by the treaty. The title to the land in question passed by the treaty, and became vested in the United States; and there has been no act, on the part of the United States, by which they have parted with the title. It is contended, however, that this right of title has been taken away by the original decree in this case, under the act of 1824. By the fourteenth section of that act, all its provisions are extended to the territory of Arkansas; and it is declared that the superior court of that territory shall have, hold, and exercise jurisdiction in all cases, in the same manner, and under the same restrictions and regulations in all respects, as is given by the said act to the district court of the state of Missouri. And by the second section of the act, it is declared that in all cases the party, against whom the judgment or decree of the court may be finally given, shall be entitled to appeal within one year from its rendition, to the supreme court of the United States, the decision of which court shall be final and conclusive between the parties; and should no appeal be taken, the judgment or decree of the district court shall in like manner be final and conclusive. No appeal was taken within the year; and the question is, whether the United States, by neglecting to appeal, have lost their right, and if not, whether the remedy provided by the act of 1830, to assert that right, is in violation of the constitution.

If Samperyac was a real person, and appeared here setting up this objection, it might present a different question, although it is not admitted, even in that case, that the United States would be concluded as to the right. But the original decree in this case was a mere nullity; it gave no right to any one. The title still remained in the United States, and the most that can be said, is, that by omitting to appeal within the time limited by the act, the remedy thereby provided was gone, and the decree became final and conclusive with respect to such remedy.

But the act of 1830 provides a new remedy; and it may be added that the act of 1804 declares the decree to be final and conclusive between the parties. And as Samperyac was a fictitious person, he was no party to the decree, and the act, in strictness, does not apply to the case. But, considering the act of 1830 as providing a remedy only, it is entirely unexceptionable. It has been repeatedly decided in this court, that the retrospective operation of such a law forms no objection to it. Almost every law, providing a new remedy, affects and operates upon causes of action existing at the time the law is passed. The law of 1830 is in no respect the exercise of judicial powers. It only organizes a tribunal with powers to entertain judicial proceedings. When the original decree was entered, there was no person in existence whose claim could be ripened into a right against the United States by omitting to appeal; Stewart was not only no party to the decree, but his purchase from Bowie was nearly a year after the decree was entered.

Had Samperyac been a real person, having

27 FED. CAS.—60

a decree in his favor, and Stewart had afterwards purchased of Bowie the right which that decree established, it might have given him some equitable claim; but it would have been subject to all prior equitable, as well as legal rights. Nor would it be available in any respect in the present case, for Stewart, in no manner whatever, connects himself with Samperyac. As it is admitted that the deed purporting to have been given by Samperyac to Bowie is a forgery, Stewart is therefore a mere stranger to this decree, and can derive no benefit from it. It is said, that if this bill of review was filed under the act of 1830, the court had no jurisdiction, the bill having been filed in April, and the law not passed until the May following. But the act, in terms, applies to bills filed or to be filed, and of course cures this defect, if any existed. Such retrospection is no unusual course in laws providing new remedies.

The act of 1803, amending the judicial system of the United States (3 Bior. & D. Laws, 560 [2 Stat. 244]), declares, that from all final judgments, or decrees, rendered or to be rendered, in any circuit court, &c., an appeal shall be allowed to the supreme court, &c. It therefore forms no objection to the law, that the cause of action existed antecedent to its passage; so far as it applies to the remedy, and does not affect the right.

3. But it is objected, in the next place, that this bill of review cannot be sustained under the act of 1830; that it was not filed and prosecuted under limitations and restrictions, and according to the course and practice of a court of chancery in such a proceeding. We think it unnecessary to examine, whether all the technical rules required in the ordinary course of chancery proceedings, on a bill of review, have been pursued in the present case. The act, clearly, does not require it. It authorizes bills of review to be filed on the part of the United States, for the purpose of revising all or any of the decrees of the said court, in cases wherein it shall appear to the said court, or be alleged in such bills of review, that the jurisdiction of the same was assumed, in any case, on any forged warrant, concession, grant, order of survey, or other evidence of title.

If congress had a right to provide a tribunal in which the remedy might be prosecuted, they clearly had a right to prescribe the manner in which it should be pursued. The great and leading object was, to provide for revising the original decree, or granting a new trial. The material allegation required is, that the original decree was founded upon some forged evidence of title; and this is very fully set out in the bill. That it was not the intention of the law, that the court should be confined to the technical rules of a court of chancery, on bills of review, is evident from the provision in the last clause of the first section of the act, which directs the court to proceed on such bills of review, by such rules of practice and regulations as they may adopt, for the execution of the powers vested or confirmed in them by the act.

4. The next inquiry is, whether the appellant, Stewart, has acquired a right to the land, by reason of his standing in the character of a bona fide purchaser. The record contains an admission on the part of the United States, that he purchased the claims of John J. Bowie, by deed, for a valuable consideration, in good faith, some time in November or December, 1828. But this gave him no right to be let in as a party in the bill of review; he was not a party to the original bill, nor could he connect himself with Samperyac, the only party to the bill, he being a fictitious person; and the interest of Stewart, whatever it might be, was acquired long after the original decree was entered. He was, therefore, a perfect stranger to that decree. The deed purporting

to have been given by Samperyac to Bowie, is admitted to be a forgery. Bowie, of course, had no interest, legal or equitable, which he could convey to Stewart. But, admitting Stewart to have been properly let in, as a party in the bill of review, the only colorable equity which he showed was the certificate of entry given by the register of the land-office, December 13, 1828; and this certificate, founded on a decree in favor of Samperyac, a fictitious person, obtained by fraud, and upon forged evidence of title.

This certificate is entirely unavailable to Stewart. He can obtain no patent under it if the original decree should remain unreversed; for the act of 1830 forbids any patent thereafter to be issued, except in the name of the original party to the decree, and on proof to the satisfaction of the officers, that the party applying is such original party, or is duly authorized by such original party, or his heirs, to receive such patent. The original party to the decree being a fictitious person, no title would pass under the patent, if issued. It would still remain in the United States. But Stewart acquired no right whatever under the deed from Bowie; the latter having no interest that he could convey. In the case of Polk's Lessee v. Wendall, 5 Wheat. [18 U. S.] 308, it is said by this court, that on general principles, it is incontestable that a grantee can convey no more than he possesses. Hence, those who come in under the holder of a void grant can acquire nothing.

Upon the whole, we think Stewart was improperly admitted to become a party; but considering him a proper party, he has shown no ground upon which he can sustain a right to the land in question.

The decree of the court below is accordingly affirmed, with costs.